Thank you, Mr. Chief Justice, and may it please the Court. The key to spending clause statutes, this Court said in Arlington Central School District, is what the states are clearly told regarding the conditions that go along with the acceptance of federal funds. Among the most costly conditions that may go along with the acceptance of federal funds is exposure to private litigation under Section 1983. This Court made that precise point in Barnes v. Gorman, in which it said with respect to a school that, without doubt, the scope of potential damages liability is one of the most significant factors a school, or as in this case, a nursing facility, would consider in deciding whether to receive federal funds. States are therefore entitled, in our view, to clear notice that they will be subject to such private lawsuits if they accept spending clause money. Such a clear notice rule comports with the federalism and separation of powers, principles at stake in these cases, and it accords as well with the common law treatment of third-party beneficiary claims at the time Section 1983 was enacted. At common law, third parties generally could not sue to enforce government contract rights unless the contract clearly specified that the breaching party would be liable to injured third parties. Because the Federal Nursing Home Reform Act contains no such clear statement, it should not give rise to Section 1983 liability. But even if a clear notice rule is not required, the two purported rights that Respondent invokes under FINRA do not give rise to Section 1983 claims. First, FINRA and its implementing regulations provide a comprehensive suite of remedies, including a more restrictive private remedy that forecloses Section 1983 relief under Rancho Palos Verdes. And on this dispositive point, this U.S. Solicitor General agrees with us. Second, the two rights Respondent invokes are not unambiguously phrased in terms of the persons benefited. Instead, the two rights invoked here today are but a small piece of an overarching set of requirements addressed to nursing facilities that receive Federal money. And the command to protect and promote those rights are, as in Blessing, system-wide commands, not an unambiguous assurance of individual entitlement. What do you mean by system commands? In that, as in Blessing, the language of the statute, Mr. Chief Justice, is directed to the rights of the obligation of the nursing facility to take care of the entire system and not focused on any particular individual. The language, protect and promote, to promote something, it seems to me, evokes the notion that you are looking out at the whole system in which you promote and protect a certain right. No, I think you have a stronger argument on promote, though, than you have on protect. Yes. And the statute uses both and then, you know, lists a variety of rights, and it seems to me that if you're supposed to protect those rights and you're the person who's responsible for conferring, living up to those rights, that seems to me that it ought to be sufficiently direct under Blessing or Gonzaga or any of the others. I'm not inclined to think so, though, to be sure, I think the stronger of our two Gonzaga arguments is the C. Clamor's preclusion argument. That's our first submission with respect to the question two. But I would say, with respect to your Honor's question, it is a mistake, I think, to pick out the particular clauses that embody these two rights and divorce them from the rest of the statute. Pennhurst, after all, enjoins the court to look at the whole statute, and when you do that, when you look at the whole statute, the entirety of the FINRA amendments, what you're going to see is that the core of it, contained in subsections B, C, and D, are a series of commands to the nursing home to regulate and manage its facility in a particular way. C refers to the nursing home's ability, responsibility to protect and promote certain rights. That's true. B, on the other hand, talks about administrative obligations, as does D, whereas E and F are directed respectively to the states and to the federal government, to the secretary. That is to say, each one of the substantive sections of these amendments is directed to the particular office or officer that has the duty to promote the underlying obligations. And so, I would say that even though it's... Well, that's true. Go ahead. I guess I'm just not sure, Mr. Robbins, what that gets you. It's a big statute. It does a lot of things, but one of the things it does is to say every nursing facility has to ensure that individual rights are respected, and lays out in considerable detail what those rights are, and say, it's your job to see that those rights are fulfilled. Well, again, it is our view that, taken as a whole, these are directions to the nursing facilities. Even subsection C, which is the one in which these rights can be found, begins with the command, the nursing home shall. And so, you know, if you're asking the question... Well, it's true that the nursing home is involved in this, because the nursing home is the entity that's supposed to respect the individual rights that are laid out. I mean, you have to think that any individual right imposes a correlative duty on somebody, and here, it's the nursing home that is supposed to make sure that those rights are not violated. I don't disagree with that at all, Justice Kagan. What I do think, however, is that, and again, this is on the assumption now that we're talking about the Gonzaga Inquiry, my threshold argument is based on the common law at the time Section 1983 was enacted, and on federalism and separation of powers principles. But if we are now in the guts of Question 2, I would suggest that the individual patient is not the unambiguous focus of this statute. It says rights. I mean, it says rights. It's very uncomfortable. In fact, for you, the statute says rights over and over again. Yes. It precisely, and no less so did... Residence rights. Yes. Of course it says rights. This court has twice faced that precise circumstance, Justice Kavanaugh. It did in Pennhurst itself with a long section of bill called Bill of Rights in Section 6010 of the Rehab Act of 73. That wasn't enough. The then Chief Justice Rehnquist said for the court that we don't pick out little words like rights. A point repeated by this court in 2002 in footnote 7 of Gonzaga. The mere fact that the word right is sprinkled through the statute, obviously I don't dispute that, is not enough to get you over the unambiguous focus hurdle. But let me be clear. Of the three arguments I'm making today, I promote two ahead of that. And on those points, I think there is not... What's your first argument then, that we should overrule the precedent, right? Well, the first argument is that it should extend the principle in Gonzaga to take account of the state of third-party beneficiary law at the time 1983 was enacted. That is our answer on question one. On question two, we have two answers. But the first of those is that this is a case of sea-clamorous preclusion, that the set of remedies provided in subsection H-8 provides a comprehensive... In sea clamors, there's a citizen suit provision. Indeed. But this court has twice now taken account of the sea clamor and its progeny, and twice, once in Rancho Palaverdes and once in Fitzgerald, has said that the dividing line between what is preclusive and what is not is whether there is a private remedy. Not a private judicial remedy, much less a private federal court remedy. A private judicial remedy. That's what this court has twice said is the dividing line in that body of law. There is no question, no even fair debating, that there is a set of private remedies. Private judicial remedies or private administrative remedies? Private administrative remedies. And we've said that the existence of a state administrative remedy does not ordinarily foreclose resort to 1983. The Solicitor General quotes that portion as well, and I just want you to respond to that. How do we address that? Well, first off, these are not simply state remedies. There are remedies that both the Secretary can enforce, including the right to bring a grievance to the Secretary and a grievance to state officials. But I would say, Justice Kavanaugh, that I really do insist on the dividing line that this court has articulated more recently than the language that you've quoted. It seems to me Fitzgerald... I'm sorry to interrupt. I don't want to take too much time, but that's a key point for me on the comprehensive scheme argument, which is what exactly is the dividing line? I mean, I've got the case, I've read the cases. What do you think is exact formulation of the dividing line? I think if I'm reading the two cases I've just cited correctly, and I think I'm citing the language almost verbatim. In fact, I think it uses the phrase, the dividing line, if I'm not mistaken, in both Fitzgerald and Rancho Palos Verdes. And what the court has said is, if there is a private remedy, in fact, in one of the cases I can't now recall, it actually says judicial or administrative. You think any private remedy at all is... No. No, I don't think so. Because I thought that we looked for some understanding of incompatibility, that we looked for some ways in which the other private remedy was in conflict or at least in tension with 1983. So in those cases that you're citing, those cases all had remedial schemes, which had various requirements. They forced you to give notice. They required you to file at a certain time, things like that. And if you gave a 1983 suit, it would be a way of evading all those requirements so that you could see that there was some kind of tension between the remedial scheme and 1983. I don't see any of that here. But I, respectfully, Justice Kagan, I don't think that's the way this court has thought about the preclusiveness of remedies. I don't contend that 1983 is somehow flatly inconsistent with the comprehensive remedies provided under H-8. Or even in tension with, or even that 1983 would give you an out, and so you could escape the requirements of a different remedial scheme. Well, I think there are respects in which that's true here. For example, there are provisions that require that the Secretary, as I recall, there are provisions that require, that give, for example, the states discretion as to whether they're going to exercise any of their remedies, including because, for example, they're managing the facility, they're looking it over, and they don't want to terminate funding, or they want to take some lesser step. I would contend that private litigation, which, of course, is not constrained in that way, is in fact antithetical to the discretion that states and the Secretary have. But I also quarrel with the premise, Your Honor, I do not think I have to show that 1983 is at odds, or even in tension, with the elaborate administrative proceedings provisions given here. Well, aren't we trying to figure out, I mean, this is a matter of statutory interpretation, we're trying to figure out whether Congress meant to preclude the 1983 suit. And it can't be the case that Congress would mean to preclude the 1983 suit by doing any old thing. I mean, other administrative remedies can be perfectly complementary with the 1983 suit. So we have to be looking for something more than that Congress has provided some other remedial avenues. Well, I think in this case, it's quite comprehensive. And what's striking about this case, of course, is that Mr. Galefsky availed himself of all of those provisions, got the relief he wanted, and then came back to court for money. So this is a case where the actual regulations did a terrific job. But again, let me just finish why I quarrel with Your Honor's premise. To me, as I read the body of law that was started with sea clamors and goes through Robinson and then up to City of Palo Verde, what the court has said is, we usually begin with the assumption that the provision of one remedy excludes the others. I don't think that that's the presumption here. I think once there's been found to be a statute with the character of giving rights, the presumption actually is in favor of 1983, because that's what 1983 is supposed to address. And we're looking to see whether another statute negates that presumption by doing something particular that suggests that Congress wouldn't have wanted the 1983 suit to go forward at the same time. So we need something more than another scheme that does something. We need a sense that that other scheme was meant to be exclusive, that it would have been thought to be incompatible with 1983. I would take a page from the Solicitor General's argument, of course, that it is surpassingly odd to imagine that we would have more exacting obligations on the very thin slice of state nursing homes that get federal money under this program. I'm going to leave that argument to them, and I hope they make it. Mr. Robbins, can I just give you – are you finished with this argument? Well, if I might, just – Yes. I don't – I certainly agree, there's no disputing that the presumption that Your Honor called my attention to is correct. If the statute – if there is an enforceable right, with which, of course, I quarrel, but if there is, it is true that there's a presumption that 1983 kicks in, unless, of course, you take my view of the first question presented, which is that, as a general matter, 1983 did not permit third-party beneficiaries – That's what I wanted to talk about. And I do want to come to that, but the fact that the burden shifts to us to prove that Congress intended to foreclose it, that's all well and good. The question is, what do you do to discharge that burden? And in case after case, this Court has said that when Congress actually provides for a remedy, we usually begin with the premise that that's – you know, I always get the Latin wrong, but I think it's exclusio unius, or something to that effect. That's in the case law, and it exists notwithstanding the fact that it becomes our burden to suspend or sustain that – our burden to show that 1983 is not available. One – Thank you, Counsel. I just have one last question. On the alternative remedy for grievances, does it matter that what you rely on the most is an administrative regulation rather than a statutory language? Because obviously, the statutory language, you can analyze that as what the state was on notice about or not, but I don't know that that's true with respect to subsequent regulations. Well, I think our view is that if a regulation fairly interprets the statute, then that counts towards the same preclusive effect that the statute would. Nobody contests that proposition in front of the Court today. Nobody says that a regulation can't have the same preclusive effect. Well, I would contest that proposition, since the whole premise is that the state has to be on unambiguous, clear notice. And how can that be with respect to a regulation that hasn't even been issued at the time of the statute? Well, I'm not sure that the contract metaphor – I mean, this Court has said in case after case that the contract metaphor is to limit the scope, not to expand the scope. I'm not sure why a state would need to know that a 1983 – I'm not sure why the state would need to know what the regulations are all about. Well, because you're talking about contract, the regulations can go two different ways. One could be a regulation that expands the obligations of the state, rather than the state. That's not an issue here. Yes, no, I recognize that. But I guess if what we're talking about is what the states clearly understood as a condition, I would then recur to my central argument on question one, which is that no state would have thought that a private party could enforce the contract that consists of FINRA, because it doesn't advert in any way to the right of a private party to bring the lawsuit. But isn't that a shift from – Thank you. Justice Thomas? Justice Alito? Well, Respondent relies on the Savings Clause, and you responded only very briefly to that in the reply brief, so I wanted to give you another chance to talk about it. The Savings Clause says the remedies provided under this subsection are in addition to those otherwise available under, for federal law, and shall not be construed as limiting such other remedies. Why doesn't that apply directly here? It doesn't say – the provision does not say that the right that is asserted must arise from some source other than the law at issue. It supplements remedies. It says that this does not take away remedies, and 1983 provides a remedy. Yes. Thank you, Justice Thomas. I appreciate it, Justice Alito, and let me provide two answers on that. The first is, both in Rancho Palo Verde's and in, I want to say, at least one other of this Court's cases – maybe it's Robinson – the Court has said that when we refer – when a so-called Savings Clause refers to federal law or federal statute, it is referring to statutes other than the very one that contains the Savings Clause. That's our first submission. But I'd like to follow on to that, because I think, if that's correct, the Savings Clause is our friend, not theirs. And the reason is this. It says, in essence, the rights in this section, H. 8, which I have invoked as preclusive, the rights contained in H. 8 are in addition to those in federal statutes. If federal statutes means all statutes other than FINRA itself, then that seems to me pretty strong evidence that there are no other remedies except those found in, for example, the Americans with Disabilities Act or the Rehabilitation Act of 1973. That is to say, the Savings Clause says these rights are for any other federal – are in addition to other federal statutes. That seems to me to preclude the argument that they are relying on, which is an argument that 1983, married with FINRA, gives them certain rights. I think the fair reading of the Savings Clause is against that combination, precisely because its reference to statutes is to statutes other than FINRA. And without FINRA, they've got no 1983 claim in this case. Justice Sotomayor? That's okay. That's fine. Counsel, do you dispute the Amici legal historian's point that the prevailing rule in American common law in the 1870s, before 1983 was passed, permitted third-party beneficiaries to sue? I absolutely do. And I'm so glad you – So that's just a matter of our reading of history. If we disagree with you, what's left? Well, can I just perhaps answer the question by suggesting where they got it wrong and where instead we – the court may wish to be looking? Okay. What they are saying – they quote a particular secondary article in which somebody actually went to the trouble – There was more than one, but let's keep going. In which somebody actually went to the trouble of adding up all the cases and then saying 72 percent of these were allowed and 62 percent of these were allowed. But if you look at footnote 22 of the principal source they rely on, you will see that the author cut out from his sample all the so-called incidental beneficiary cases, which are the ones we say are most like a spending clause statute. In other words, the game was rigged. The denominator was gerrymandered to gin up very high numbers. But if you go back and look at all of the government-to-government contract cases, and I've looked at a fair bit of them, you will find that unless the government contract called out the plaintiff, for example, the Schneier case from 1918 in New York, or the Little case that it cites from 1880. In those cases they said, you know, these were the water company and fire company cases of the 19th century. Generally speaking, if your house burned down because the water company didn't put enough water in the hydrants, you were at a loss. But none of those contracts. I'm sorry? The incidental contracts are different than the ones you even admit if you call out the plaintiff. Isn't that what Lessing and Gonzaga are saying? No. If the contract is giving a right to a particular class of people, that is a third-party beneficiary. I respectfully suggest that it is not, because if you look at the cases I've just described, what you will find is that the contract had a, for example, Schneier is a water company case and it said, in substance, if you don't deliver the water, you will be liable to anyone who is injured. In the Little case from 1880. But that's what 1983 says. If I confer a government right on you, the state is going to be liable if it violates the law. Is that right? No. Well, actually what it says is, if it violates a right secured by law. Exactly. If I have a right under the law to a certain thing that the government has contracted with the provider to give me, 1983 says I can go to court. Well, I don't think it's quite that simple. I think what is secured by law depends, among other things, on how 1983 would have been understood at the time it was enacted. And at that time, you could not sue on a government-to-government contract unless, and this is the general state of the law, as Cummings directs us to look at, not little outliers from the regression curve, but the main curve that joins most of the cases. What you will find, Justice Sotomayor, is that when somebody had the right to sue, somebody whose house burns down, or somebody who doesn't get a benefit from a government contract, the contract said you will be liable to third parties if you breach this contract. Except that, as Justice Alito pointed out, this spending clause provision provides that all other remedies of law, i.e., 1983, are not superseded. No. I didn't take Justice Alito to be agreeing with that proposition, and I certainly do not agree with that proposition. The language of the savings clause says these are in addition to laws provided by statute, constitution, and common law. And this Court has said in several cases that the reference to statutes is to statutes other than the very statute containing the savings clause. That means other than FINRA. And if it means other than FINRA, which is the way I read it and the way this Court has read it more than once, then they have no claim. Because FINRA is not a statute other than FINRA itself. Justice Kagan? Justice Gorsuch? Justice Kavanaugh? If I understand your position on the preclusion, the implied preclusion, you're saying if there is a private judicial remedy in the statute, then that would ordinarily mean no 1983 suit. Correct so far? I certainly agree with that. Okay. And then you're saying if there's a private administrative remedy in the statute, that also usually, and here, precludes 1983. Correct? Correct. Okay. Some of the language supports you in the cases, some doesn't. The three cases where we've held that have involved private judicial remedies, however. Correct. That is correct. So the issue here, I think, if we get to this issue, we'd have to nail down is exactly under what circumstances the private administrative remedy in the statute precludes 1983. Does that sound like the question? That does sound like the question. On the other hand, with all respect, The government has a whole different theory. I get that. We'll get to that. Yes. The government has a different theory. I don't want to get to that now. Fair enough. But on that proposition, I don't think I can do better than to cite this court's cases that have said, that have told us where the dividing line is. Right. But even those, like if you look, and then I won't belabor it too much, but Rancho Palos Verdes says in all the cases in which we have held that 1983 is available, we have emphasized that the statute at issue did not provide a private judicial remedy. Yes. They did say that as well. They are in most of the cases, that's key, most is a key word there, even a private administrative remedy. Fair enough. But they go on to also say the so-called dividing line point. Yes. That helps you. I agree. And it helps me. I think I'm done. Okay. Okay. Well, thank you. Okay. Justice Barrett. I'm a little bit surprised, I guess, by the focus on the third party beneficiary point. And this is why. If you have, and I think this dovetails with Justice Sotomayor's questions, it is true that in spending clause legislation, we have focused on the contract analogy. And so as the Chief Justice was pointing out, we want to know when a state accepts the funds, if it was on notice of its obligations. Right. In the 1983 context, I would have thought that the question is, does this statute create rights? The blessing Gonzaga question, arguably, just the Gonzaga question after Gonzaga. But if so, then you are referred to 1983, and the scope of that cause of action is dictated by 1983. The question about third party beneficiaries and the scope of the cause of action, I would have thought, arose only when we're talking about implied causes of action, like Cummings last term, for example. If you're talking about it against a private party, if you wanted to know what a private party might have signed up for, and you're talking about an implied cause of action from the statute itself, then it might make sense to ask whether a third party beneficiary was entitled to sue, or whether punitive damages would have been available for this kind of breach. I just don't see the connecting of the dots in your situation when we're talking about resort to 1983. Well, let me take a crack at it. I think the principle here is the same without regard to whether we're talking about purely implied rights of action or 1983 claims. And here I take the guidance from Gonzaga, which said that while it's true that you don't have to show an intent to create a private remedy, because 1983 already does that, you do have to make the same inquiry about whether this is a right secured by law. And what we're saying is that whether a right is secured by law depends, among other things, on whether or not, at the time 1983 was enacted, what the common law principles were. And it carries the old soil with it. And this is a point I want to make sure I leave the court with. The question whether they have an—I'm sorry, Mr. Kolefsky and his family have an enforceable right turns on the marriage of two statutes, 1983, which brings with it whatever limitations are part of 1983's history and context and language, and the rights contained in the statute that provides the substantive rights. And it's the combination of those two statutes and whatever old soil they bring with them, which is why, among other things, the solicitor general's argument that why are we looking at 19th century principles when FINRA was only enacted in 1987? Well, it's not as if, you know, the answer— I think you've answered my question. Okay. Thank you. Justice Jackson? Yes. But that was my question, too, so let's explore a little bit. I mean, I don't understand your suggestion that an express cause of action, which I think we can all agree is what 1983 is, that says that you can sue to vindicate individual rights that are created by the Constitution or laws of the United States. I don't understand why that carries with it common law that preceded it under circumstances in which you couldn't sue. So you seem to be suggesting that there isn't—this isn't a situation in which Congress was actually providing a cause of action where there wasn't one before, which when you look at the actual history of 1983, that was precisely what Congress was doing. It was a part, in 1983, of the Ku Klux Klan Act where Congress had looked at the situation of states not giving forum, not giving a cause of action to people who were being terrorized, and instead of adopting and incorporating those principles and saying here's this new law and we're going to incorporate the common law of excluding you from the court, in fact, Congress created the right in order to allow people to go to court. So while there might be situations in which we carry old soil into our interpretation, I don't understand how you can interpret an express grant of authority to go to court to enforce rights created by law consistent with the opposite situation at common law and say we have to limit the current right because in common law you didn't have that right. Okay, well, I have a number of parts of answers that I'd like to be able to give and I don't— Let me just ask you this, this way. How do we have authority to do that? Wouldn't that just be us rewriting the statute? You're not saying that laws is ambiguous in the statute, are you? I am not. All right, so if it's—usually we only get to step in and look at common law or whatnot to assist in the interpretation of a statute. But if you agree that this is unambiguous, that Congress was giving people the right to enforce, you know, laws that gave them certain rights, and if you agree that FINRA is a law, maybe you don't. I do. Okay, then it seems to me odd to suggest that we as a court can reinterpret the word law in Section 1983 to carve anything out. An old professor of mine wrote a book in which he said, no answer is what the wrong question begets. Whether or not laws is supple enough to include 1983 or FINRA, that's the wrong question, respectfully. The right question is, what rights are secured by law within the meaning of 1983? And this court has consistently held that when it comes to spending clause statutes, the common law of contracts gives us the clearest window into what 1983 covered. But isn't that only if there was some ambiguity about what rights are being secured by the term laws? And isn't your answer one that has to reference what Congress would have intended? What I don't understand is why your argument, why you've come to the conclusion that when Congress wrote laws in 1983, it was thinking, oh, but not the laws that we enact pursuant to our spending clause power. Those are not the ones we intend to be secured by this. I see no evidence of that anywhere. I'm not contending that there is affirmative evidence that the 1870, the Congress that enacted 1983 in 1871 actually had third-party beneficiary principles in mind. But isn't that what you have to have in a law? No, it is not. The way this court has talked about common law principles is that it is presumed that Congress adopts common law principles, Justice Jackson, unless there is affirmative evidence that they did not. And the explicit language of the statute is not affirmative evidence to the extent that it conflicts with the state of the common law. Oh, well, if I thought there was text that actually foreclosed the adoption of common law principles, I would be the first to agree with you, Your Honor. But I find no such evidence that FINRA or 1983 abrogates the common law against which 1983 was enacted. And when we ask the question, what rights are secured by law, I contend that it is the marriage of these two statutes. 1983 enacted in 1871 and amended to add laws in 74, and FINRA enacted in 1987, and they both bring the old soil with them. Thank you, Counsel. Mr. Fisher? Mr. Chief Justice, and may it please the Court, 20 years after Gonzaga, Section 1983 spending clause cases are unpredictable with three consequences of particular concern for states. First, they frustrate informed state assessment of spending clause programs. Second, they disrupt state efforts to administer complex spending programs using scarce resources. And third, they prevent states from pursuing policies valued more highly than full federal funding. Fundamentally, private enforcement of federal spending conditions takes officials off the political hook for policy decisions and leave voters without any elected officials to blame. Accordingly, the Court should finish what it started in Gonzaga and hold that federal spending conditions are not privately enforceable unless Congress expressly so provides. I welcome the Court's questions. Well, Gonzaga, I wouldn't say it went that far because it didn't, but it imposed a pretty high bar in terms of the evidence that was required. Why isn't that sufficient? Well, it used words like unambiguous and so on and so forth. I think the proof is in the pudding here, Chief Justice. Lower courts aren't able to come to any kind of consistent decision-making with respect to Medicaid and other spending clause programs. They're all over the map, and I think that notwithstanding the use of the term unambiguous, lower courts are finding everything quite ambiguous. And I think that's why we think of it in terms of if the Court wants to stick with a framework such as Gonzaga, maybe the way to do it is to say, well, by unambiguous, we mean express right of action. I think that that's probably the only way to get away from such a flexible standard and get to a rule that actually is meaningful. And you don't read 1983 as being an express right of action? Of course it's an express right of action, but I agree with Mr. Robbins that the question is what did Congress, what could Congress, what can we infer that they thought they were doing at the time? And I think it's critical that, well, it's always important, if not critical, that 1983 is properly thought of, I think, as a tort statute, not a contract statute. And we're talking here about contracts, about who can enforce them. And the kind of entitlement programs that we deal with today simply weren't around in 1874. No, no, no, but Mr. Robbins says, you say tort statute 1983, totally agree with you, that seems to be what Congress was doing. So why does the common law of contracts have any role in us trying to understand what 1983 is about? Precisely because this Court has talked about it in Pennhurst and in other cases that spending clause programs are in the nature of a contract. Yeah, but you're skipping ahead. Now, I'm just talking about what Congress would have intended at the time that 1983 was enacted. Precisely, and I think Congress at the time 1983 was enacted was thinking of torts, not third-party contract enforcement rights, which I think is the proper analogy to this type of case. So I think that that's why there's such a poor fit between 1983 and spending clause, you know, statutes on their own. They just don't coincide historically, I think. Mr. Fisher, why wouldn't your problem about the lower court confusion be addressed by our simply saying, listen, Gonzaga is a more recent case and it laid down a stricter standard than did Blessing, and so Gonzaga is where you look? With respect to Your Honor, I think that if the Court were to do that, states would be back here in case after case after case asking for clarification. If Gonzaga didn't do it, talking about unambiguous rights, I don't think another restatement of that is going to do the trick. I think the Court has to be far more explicit about that. It has to reject, certainly Wilder, which lower courts, including in this case, continue to cite, and I think it needs to set forth a very precise rule that lower courts know that they have to follow, and that would be no implied rights through 1983 in spending clause statutes. I'm sorry, Chief Justice. Just very briefly, I thought we did drive a wooden stake through Wilder in Gonzaga and Armstrong. It's pretty explicit. I agree, but lower courts don't. They cite Wilder all the time, and especially in the context of Medicaid litigation, we can't get around Wilder. That is the case. So why don't you bring us a case where the right is more ambiguous? This case doesn't seem to present that confusion that you seem to be referring to. Well, regardless of this particular case, I will submit... No, we're not asked to give advisory opinions. We have a standing precedent. You're asking us to overrule it. As the Chief said, Gonzaga and Blessing came after Wilder, and they've limited its holding very clearly. You're now asking us to overturn all these programs, but neither the federal government or the states can possibly investigate and remedy every violation of these rights that are given to people. 1983 speaks clearly. They have a judicial remedy. Why shouldn't we just respect our precedent? Well, I think what we have through spending statutes is a relationship that Congress establishes between states and the federal government. And I think, in fact, if you look at something like Medicaid, the only lawfulness directive is to the Secretary. And so it's, I think, important to look at these statutes more broadly. But I will say also, there are other cases waiting in the wings if this court wants to wait to get to that issue elsewhere. But I don't think that, you know, it's going to help anybody just to address FINRA in this case. I think it's going to help a lot if the court gets at the fundamental question about, you know, generally speaking, when are spending clause statutes privately enforceable in 1983 cases? Justice Thomas? Justice Alito? Well, when you say that 1983 is about torts and not about contracts, do you mean to say that if a condition of a spending clause law was that the state agrees to be sued under 1983 for rights conferred by that statute, that that could not be the basis for a 1983 claim? No, I think that's exactly the sort of thing that we want Congress to have to say. I think the point is that, you know, it's not that Congress can't direct something here. And specifically, when it's extending an offer to states and states can agree with it in an informed way, but just to try to, without that, try to map onto 1983, what is essentially a third-party contract relationship, I think is just an ill fit to begin with. So you just want proof beyond a reasonable doubt, basically? I wanted to express statement, a clear statement. I think, you know, there is a useful analogy here, perhaps even to sovereign immunity. And that's the kind of thing that we want with respect to the right of action. Justice Sotomayor? No further questions. Maybe? Justice Axel? I would just say that clear statement rules and the court's precedents usually exist against the backdrop of the kinds of rights like sovereign immunity or habeas or that sort of thing. And so it just seems odd to me that in this situation, your position would be that Congress had to be clearer than saying all laws and rights created under the Constitution. Well, I think it goes back to that fundamental state-federal relationship, which is akin in some respects to sovereign immunity and to that inquiry. Congress can't go beyond its numerator powers. It can't direct states to do particular things, but it can invite states to do them by extending, you know, an offer the state's accepting. And I think part of that relationship and making sure that there's legitimacy to that broader, you know, exhibition of power is a clear statement. Here is what you're in for if you take this money. Thank you, counsel. Mr. Snyder? Mr. Chief Justice, and may it please the court. For half a century, this court has recognized that Section 1983 means what it says, providing an express cause of action that by default applies to rights created by any federal statute. Petitioners provide no sound basis for revisiting that precedent. First, they offer no evidence that the Congress that enacted Section 1983 would have viewed breach of contract suits by third parties as remotely relevant to the new tort it was creating. Second, petitioners can't show that their rule was a sort of well-settled background principle that Congress incorporates into a statute silently. And finally, Congress has affirmatively confirmed that some rights created in the Social Security Act are enforceable through Section 1983. Disregarding that ratification would unsettle decades of legitimate legislative reliance. This court should accordingly reaffirm the framework that it applied in Gonzaga and Blessing. Applying that framework here, however, we agree that Congress displaced Section 1983 in FINRA, and we therefore ask the court to reverse on that basis alone. I welcome the court's questions. So you think that same question I posed to Mr. Robbins, in terms of looking to see if there's a comprehensive remedy, do administrative remedies provided by the Secretary count? So I think we would articulate the standard, frankly, much like Justice Kagan did. We think that they can count in some circumstances. We certainly don't think that they count in all circumstances. This court has said that ordinarily a state administrative remedy is not sufficient to displace Section 1983, but for two reasons we think the remedy that Congress created here is sufficient to displace 1983. The first is that it is an extensive system of remedies that include enforcement mechanisms by the Secretary himself. So the states administer FINRA in the sense that they provide surveyors who go out to each facility each year to make sure that the facilities are in compliance with FINRA. But there's also an additional process by which the Secretary can impose sanctions on each facility. They can impose civil penalties of up to $10,000 per day per violation. They can cut off further Medicaid funding at the facility. They can require the installation of new management at the facility, and they can even order the facility to close. So we think those administrative mechanisms by the Secretary are significant. I understand how you, how administrative remedies that lessen the burden on the recipient, the states, certainly could be taken into account. But if the requirement is that the states know unambiguously what they're agreeing to, how can administrative remedies that expand their liability be taken into account? Taken into account the other way. So Mr. Chief Justice, when this court has talked about the unambiguous requirements in its 1983 cases, it's really focused on whether the right was set out unambiguously in the statute. The court hasn't talked about that unambiguous requirement in the second part of the Gonzaga inquiry. So I think that's a partial answer. The other thing I would say is that these administrative enforcement mechanisms are laid out in the statute. Now they're elaborated on in regulations, but the statute itself provides for all of the enforcement mechanisms that I just described. And so the state knows about those. I don't. Well, I mean, one of them is that voice grievances. I mean, that certainly doesn't set out in the statute any awareness of what type of remedies are going to be provided in that situation. No, that's true. And so the remedies that I described are not remedies for grievances. Grievances tend to be resolved at the facility level. Or a nursing home resident can also file grievances with the state long-term care ombudsman who can help to bring about an amicable resolution of those problems. The remedies that I was describing come either from complaints, which are more formal filings with the state survey commission or state survey agency, or through notice to HHS, which can then send out a federal survey team if it deems that appropriate to impose those remedies. Is there a, sorry. So I was going to go back to the other thing that I think is significant here in why we think this administrative enforcement mechanism is sufficient. We think that ordinarily, Justice Kagan, you were getting at this. Ordinarily, when you have a system in which all of the regulated parties are state actors and Congress creates an administrative enforcement mechanism, it would be unclear whether Congress intended that administrative mechanism to be exclusive. Or if instead Congress just assumed that Section 1983 would provide a background default rule that would also allow private suits. What's different about this case is that Congress was acting in an area where a substantial number of the participants are private parties. And Congress contemplated providing a private cause of action against those private parties, but left that out of the ultimate bill and enacted. And so we know that Congress believed that the administrative enforcement mechanism that it was creating was sufficient for the 90% of nursing home residents who live in privately operated facilities. And we think that's a very strong indication that it didn't believe that a private cause of action. That's an unusual line to draw and would be a new line in the case law. It's not to say it's not a good line here, but that would be different. I agree with that. I mean, we think that this case is different from the other cases that this court has considered. The cases in which. Keep going. I don't know that I was going to say anything valuable. Well, on the point about administrative remedies, I'm trying to get this sorted out, as you heard. So state administrative remedies are different from private administrative remedies in the statute for purposes of the analysis, or are they considered the same? So the statute gives the secretary. No, I mean, it's in the 1983 case law in this area. Are state administrative remedies that are available considered differently from private administrative remedies? I understand the question. I'm not sure I do. I'm trying to. So I would say that this court has said that state administrative remedies are ordinarily not enough. We think that it is significant that some of the administrative remedies available here are not state, but rather federal. I'm not sure if that's the distinction you're drawing. That is the distinction. We do think that that's significant. We don't think that every time there is a federal administrative remedy, that is necessarily preclusive of resort to Section 1983. Okay, so let me stop you there just so I can get the analysis straight. If you didn't have your argument about the private state nursing homes, so assume you did not have that argument here, would the private administrative remedies be enough to preclude the 1983 suit under our case law in the view of the government? I think it would be a much closer question, and I think it probably would not be enough. We agree with Justice Kagan that there needs to be some incompatibility or some tension, and I'm happy to talk to you. What do you do about the sentence in the case law that was referred to by the other side that says the dividing line is private remedies? So I guess I didn't take that to be articulating a very precise line between exactly which ones are sufficient and which are not. Well, it says the existence of a more restrictive private remedy for statutory violations has been the dividing line between those cases in which we have held, you know, and it goes on. That's in Rancho Palos Verdes. Now, later in the opinion, it refers to private judicial, so I'm just trying to figure this out. So to the extent that the court was talking about the dividing line between those cases in which it's actually found Section 1983 displaced and the cases where it hasn't, I think just descriptively the line is the availability of private judicial remedies. In each of those three cases, there was a private judicial remedy. Now, in cases where this court has found that Section 1983 was not displaced, the court has emphasized the lack of either a judicial or an administrative mechanism. And so we think the fact that the court has asked about the availability of an administrative mechanism suggests that in some cases that could be sufficient, and we think that it's sufficient here. When you rely on the fact that 90% of the nursing homes are private, I'm sure you anticipate what's going to come next, so... Can I do the hypo? Yeah, go ahead. So what if it's 50-50? Yeah. And our answer is the same in that case. I mean, frankly, it's helpful atmospherically that the number is 90-10, but the thing that's significant for us is that you're not in this situation where Congress would have just assumed that Section 1983 applied for all of the places in which the right was being established. So it's more of a binary distinction, and the percentage just happens to be helpful. How low do you go? We got as low as 10% of private facilities, and I think my answer was still there. Below that, Congress may have... Ten percent of private facilities. I don't want to suggest that that's an incredibly clear line-drawing problem, or line. The thing that we are getting at is whether Congress would have assumed that Section 1983 was providing a backstop in most of the cases. And here, Congress wouldn't have done that, because Congress knew that for a significant number of the cases where it was creating rights, there would be no private cause of action. And so it must have concluded that the administrative mechanism it was establishing in FINRA itself was comprehensive and sufficient at the federal level to protect those rights. But why? In Indiana, we have an amicus that tells us that, in Indiana, the majority of nursing homes are state-owned, and that in Pennsylvania immunizes government officials from any recovery whatsoever. So why should we assume that Congress wanted to take away a 1983 right as an additional remedy for a violation of a state obligation, given that these other things could immunize actors? Why is this intention, in any way? So, Justice Sotomayor, you mentioned the numbers in Indiana. That's a relatively recent development that CMS is aware of and is considering, but I don't think that would have... Well, but it doesn't destroy the basis of my question, which is, if what we're looking at is whether Congress intended these mechanisms to do away with other remedies, we know it said no explicitly in the statute, and I take it at its word. And secondly, those other remedies have benefits that are independent from the privately owned. So a couple of things on that. One is that within the administrative enforcement mechanism that Congress created, it did address this concern about sort of... I think the negative characterization would be the state regulating state entities. And in that context, Congress said that the secretary would have responsibility for certifying state facilities and gave the secretary the ability to impose enforcement remedies at state-operated facilities. So we think that Congress accounted for it in that way. You mentioned that Congress said expressly no in the statute, and I think you were referring to H-8, so I wanted to address that provision. We understand that provision to operate in the same way as the provisions that this court addressed in C Claimers and Rancho Palos Verdes. Congress in that provision was attempting to ensure that rights that residents already had independently of FINRA would not somehow be eliminated through the adoption of FINRA. It spoke specifically to... Sorry, I'm looking at the language. It shouldn't be construed as limiting... Sorry, that the remedies it was creating were in addition to those otherwise available under state or federal law. We think that that otherwise available means rights and remedies that the residents would have had without the adoption of FINRA. We don't think that was speaking one way or the other to whether Congress intended for FINRA to allow residents to bring new Section 1983 suits that they haven't been able to bring before. Seems to me that if Congress was explicitly looking to state regulation that it would want a cause of action that it already existed to apply. By mentioning the state and the obligation for the federal government to step in and regulate it more, one would think that 1983 would have a greater attraction there. So, Justice Sotomayor, we just draw a different inference from the way Congress structured the statute. We also think to get to the point of the tension between the administrative enforcement mechanism that Congress created and Section 1983 remedies, that Congress specifically directed the ways in which money collected through civil penalties are to be spent, for example, and focused that on the welfare of residents more broadly as opposed to just going to an individual resident whose rights had been wronged. And so, allowing Section 1983 suits that would sort of bypass that administrative enforcement mechanism and lead to funds being taken out of the nursing home system would be inconsistent with that congressional choice. I do want to take a moment. I haven't gotten any questions on the first question presented, but I do want to bring up the 1994 statutes, which to the extent that there is any doubt about whether Thibodeau was correctly decided, we think that the two legislative ratifications that Congress adopted in 1994 put that to rest. In those statutes, Congress wrote that in an action brought to enforce a provision of the Social Security Act, such provision is not to be deemed unenforceable because of its inclusion in a section of the act requiring a state plan. I don't think there's any way to read that legislative text other than as embracing a congressional expectation that at least some of the provisions of the Social Security Act would be enforceable under Section 1983. My friend's approach on the first question presented would say that no provisions of the Social Security Act can ever be enforced under Section 1983. We think that was wrong as an original matter, but we also don't think that it can be reconciled with those 1994 statutes. With that, I'm happy to rest on a brief. Thank you, Counsel. Well, on your 90% argument, I don't know whether this is apt, but do you happen to know what the breakdown of public and private covered entities is under Title IX? I don't. I'm sorry. I will say to the extent that it's relevant, this same question came up in Gonzales, which involved, similarly involved schools. And Justice Ginsburg asked that argument about the same sort of problem, that it would be kind of strange to say that Section 1983 is available to enforce rights against public schools, but not private schools that are subject to the same requirements. Now, that's not the basis on which the court decided it, but to the extent that respondents have suggested that this is a new idea that is coming up here for the first time, that's at least some indication that people have thought about it before. This is Sonauer. This is Kagan. Well, it does seem kind of a new idea. I mean, you know, this is a statutory interpretation question. We're trying to figure out whether one scheme is compatible with another scheme. You're not looking at text. You're not looking at structure. You're not looking at history. You're looking at, like, what you think Congress knew about the market composition. And that does seem, just as Kavanaugh said, unusual, seems unusual. So, Justice Kagan, the best analogy we've been able to come up with is that in, I'm hesitant to say this, but in this court's ACCA cases, the court has sometimes, the court has sometimes looked at what was the state of play when Congress adopted ACCA? How would it have played out? You know, what were the state rules of burglary at the time it was adopted? And we think the analysis is, you know, similar here in that you're looking at what would Congress have expected. Justice Kavanaugh? Justice Jackson? Thank you, counsel. Mr. Tutte. Thank you, Mr. Chief Justice, and may it please the court. The difference between our position and the United States' position in this case is unbelievably narrow. The United States agrees that this court should not overrule decades of precedent, holding that rights secured by spending clause laws are enforceable under Section 1983. And the United States agrees that FINRA creates two enforceable rights. And we are obviously right about those points. The only point of departure is that the United States believes that Congress showed a clear intention to preclude access to 1983 by extending FINRA rights to residents of private nursing homes, even though they're not able to use 1983 to enforce those rights because 1983 only permits suits against government actors. That gets the statute backwards. FINRA's text and context show that when Congress enacted the statute in 1987, it wanted to preserve access to all available remedies for FINRA violations to the greatest extent possible. Thus, as no one disputes, Congress expressly preserved the ability of nursing home residents to sue to enforce their FINRA rights in private lawsuits under state tort law. And as the United States concedes, Congress expressly preserved the ability of the Attorney General to enforce these rights under CRIPA, which is just Section 1983 for the Attorney General. We think it is equally clear that Congress wanted to preserve access to Section 1983 for two reasons. First, the statute says it. The statute's savings clause on Joint Appendix 123 means what it says. The savings clause says that other remedies will also be available to enforce FINRA. The legislative history confirms that that is the correct reading of the text. Second, Congress had good reason to preserve 1983, specifically for residents of government nursing homes. Congress knew that sovereign immunity often makes it more difficult or impossible to sue government nursing homes. Congress also understood that when states own the nursing homes, FINRA's scheme, which depends on states to enforce FINRA's requirements, falls apart. And Congress enacted FINRA against the background of numerous laws, like CRIPA, ARLUPA, RFRA, and Section 1983 itself, that specifically hold governments to a higher standard to protect rights than private institutions. Finally, I would also like to reiterate that even aside from all of the above, the actual standard in this Court's cases for finding implied preclusion is exceptionally high. It requires incompatibility between the remedies in the statute and Section 1983. There is no incompatibility here. I welcome the Court's questions. You said you quoted the provision you referenced in the joint appendix about other remedies. Mr. Robbins told us that the other means other than the particular statute at issue. What is your response to that? I don't think it makes sense grammatically. It says the remedies provided under this subsection shall be in addition to those otherwise available under state and federal law. And so it's talking about the remedies in the statute that are for FINRA violations. So these are taking funds away or they're actual remedies as the word remedy is used. It's not a sort of term of art. If you compare that with the Savings Clause in Sea Clambers, it said the right to pursue other relief. And the Court found that provision ambiguous, then looked to the legislative history. You're drawing a line between other remedies and other relief? Yes. Well, the way it's structured grammatically, it actually says the right to pursue other relief. And so under other statutes. So it's that when the Congress used that in the Savings Clause, the Court deemed that provision ambiguous. But the statute also had strong indicia of true incompatibility with 1983. It had citizen suit provisions that limited the available relief under federal law. So if you brought, if you made 1983 available, that Savings Clause was going to be doing a lot of work in the Sea Clambers case because it was going to be basically eliminating the private citizen supervision. It was a true incompatibility because people would always use 1983. That's a respect in which you depart from the Solicitor General. Yes, Your Honor. Yes. Can I ask, wouldn't you have a stronger argument if the residents weren't given sort of individual administrative rights in this world? And maybe they aren't. And maybe I'm not reading the statute correctly. But I understood that Congress has a scheme now for allowing, for requiring states to have plans that allow individual residents who have rights that they feel are being denied to have hearings, to have appeals, to cause the investigation of complaints. And so I'm wondering whether the incompatibility might be coming from allowing people to bring 1983 suits in lieu of following the very sort of comprehensive administrative processes that Congress has put in the statute. Your Honor, I would just, I have several answers to that question. First, I would point you to the experience of Pennsylvania. So Pennsylvania actually has had, it's clearly the law that FINRA is enforceable under 1983 for 10 years. There have been a total of 44 lawsuits over those 10 years. So you're looking at four to five lawsuits per year. I'm not sure that's an answer. You're just saying that people don't use 1983? They don't use it in lieu. Yes, Your Honor. I'm saying they don't use it in lieu of the administrative remedies because the administrative remedies are supposed to be lightweight, easy to use, fast remedies that ultimately restore the status quo. That's the nature of many of the remedies. But I guess the question is why isn't that what Congress intended rather than giving people the opportunity to get damages? And I'm looking at the administrative remedies and I see that in some sections of them there are even civil penalties that can be extracted in the context of administration and Congress doesn't say that money that you get goes to the victims of, you know, nursing home failures and neglect. So it didn't seem as though Congress really was focused on making sure that individuals in the context of these nursing homes were getting paid or getting money in compensation. Your Honor, I want to emphasize how the savings cost fits into this argument because I think even if you don't think it's an independent basis for ruling for us and gets us all the way there, it tells us what Congress's intent was on this very question because it preserved state tort actions, state private damages actions for individuals against nursing homes that violate these rights. And this is in the actual legislative history even more clearly than in the text of the statute so it confirms the text. So that's how I understand if they're still permitting people to enforce these rights in private damages suits just under state law, then why would they not also want to make available the remedy that very clearly applies in this exact situation which is a remedy that permits you to sue for the deprivation of any rights secured by the law. And you don't think the answer is found in the fact that there's just, you know, if they allow this federal right to go forward, it's really not going to be something that all of the people can avail themselves of or all of the people in nursing homes because of the idea that only a few of them are state run. Your Honor, we don't know for instance whether even though 10 percent of nursing homes were public, whether the worst nursing homes were those 10 percent. We don't know anything about what Congress knew in fact about the state of play in the nursing home industry. We don't know if Congress expected that in 10 years' time it would be flipped around and it would be 10 percent private and 90 percent public. And it actually cashes out in this case because Indiana has made more than 90 percent of its nursing homes public. So it is the exact flip reverse of the rest of the nation. And for the individuals in those nursing homes who confront very draconian limitations on their ability to actually enforce these rights under state law against state run nursing facilities, it is really Section 1983 that is filling the gap and making those rights real for those people. Congress doesn't create rights with the expectation that generally, with the expectation that someone else will come in and enforce those rights on your behalf. The way that the Solicitor General thinks this scheme should work and HHC is that you are given rights, you are told of these rights orally and in writing on admission to the nursing home, they say you have the right to be free from restraints and your family reads this and then if you, you don't actually have any rights to enforce. You don't, you, the best that you can do is you can go to an administrative. What's wrong with an administrative process though if it's comprehensive and works? And so that's A. And then B, you know, we have twice said and I know you'll want to put this in context but we have twice said the existence of a more restrictive private remedy for statutory violations has been the dividing line and so take those two. Well, Your Honor, the more restrictive private remedy language, as I read those cases, I thought it was referring to judicial, federal judicial remedies. I thought that they were being used interchangeably both because especially if you read the Fitzgerald opinion, it says, you know, they would have circumvented and required procedures prior to filing suit in sort of sentences that are right next to each other. So the way I understand private remedies is it really means federal judicial remedies and that makes sense in the broader context of statutory interpretation which is this court doesn't want to get into the business of trying to mind read Congress about what did it know about the nursing home industry when it's not evident from the face of the statute, what did it know about the policy considerations or should people in the public nursing homes have? Well, if we're clear in the opinion deciding this case about this exact point, then at least Congress going forward will know what the deal is. Well, it will to a certain extent but it would also then, if you adopt, for instance, the United States' position. Put that aside to the private remedy point. On the private remedy point, these are really the opposite of comprehensive remedies. These are minimal state level administrative remedies. They are the equivalent of saying that the nursing home should make sure that if your rights are violated, it at least has some kind of process for you telling on the person who is abusing you. The nursing home is required to then inform the state regulator and then maybe the state regulator will take action. In this very case, HHC continues to say that we got all the relief that we were seeking. We got none of the relief that we were seeking. We didn't even use any kind of grievance process. A private neurologist had to be hired to taper the drugs. There was no, there was sort of no remedy from the nursing home for the actual chemical restraints that were applied to Mr. Tlefsky. What about the point that the secretary can come in then, you know, in circumstances where there's been deprivation? Your Honor, there may be a process for getting to the health and human services secretary to actually get enforcement for rights violations by nursing homes. If there was, I promise you this family would have pursued it. But as far as I know, it was, there was no process available. So, I mean, this family was crying out for help and using every possible lever at their disposal. Section 1983 was the last resort. They went to seven medical malpractice attorneys and were turned away because the claim wasn't worth enough money in Indiana. It, this is, this is a lifesaver for people who cannot actually make effective use of the administrative scheme, and that is how 1983 functions. And it is, as we understand it, how it has functioned in Pennsylvania. So, empirically, these suits are brought actually mostly as injunctive actions to remedy systemic egregious policies of actually violating the federal rights in FINRA. So, those are the kinds of suits that, as we understand it, are being brought. Can I ask you then, go ahead. I was just going to say, the, your friend says that the policies were filed, were followed, the alternative remedies, and that Mr. Felevsky no longer had to take the medication and was entitled to return to the facility if he wished to do so. Your Honor, with respect to the first question, as, as pleaded in the complaint, he didn't, didn't get that with respect to the chemical restraints. Instead, a private neurologist was hired and worked with the nursing home to have the, the drugs removed. With respect to the transfer, they won the administrative proceeding, and the nursing home still refused his readmission. And they pleaded with the state regulator, and perhaps HEC can address this on rebuttal, but they were told, you need to go to a state court and sue for a state injunction to force the nursing home to actually take action on the administrative order from the ALJ that you just won. So that was the, that was how this actually played out in practice. And of course, in the Anderson case of the Ninth Circuit, this was so, this was considered to be such a systematic problem in the state of California that a suit was actually brought against the state of California to order the state of California to actually force the ALJ orders to be presumptively enforceable, because nursing homes would be told under the state level administrative process that they needed to take someone back, and then they wouldn't. And it is very difficult to think of this as a comprehensive remedial scheme when the remedy for being involuntarily evicted from your home by a nursing home is to go back to that place where you fear retaliation potentially, where if, if you were involuntarily transferred in, for instance, the context of this case because you were being abused, you don't want to go back. So the only available remedy isn't even the remedy that you would want. Can I ask you then about, so that's responsive to the one theory that you have to deal with on the comprehensive, on the administrative scheme. Yes, GE has, as you're well aware, an entirely different theory for why it's implicitly precluded. And I think I still think that theory is unusual, but I would like to hear your response to that. And if you know, what would be the implications of that theory for all sorts of, Justice Alito alluded to that, but for other cases. You may not know the answer to that, but if you know anything about that, I'd be interested. Well, Your Honor, I, I know that there are many spending clause programs where the, where the entitlements, where there are rights creating statutes that create rights that run against both private and public actors. And the court has never drawn this line that somehow if the right also runs against a private actor, it's a second class right, even when you're in a public facility. I mean, in the, it, for any person who goes to a public nursing home, they don't go and research sort of whether or not the private nursing homes also have a bill of rights. And so they read that bill of rights on a public nursing home's walls. And they think, I've got these rights. And usually when you have rights against the government, you think I must have some kind of remedy. That, that's one answer. The other answer I want to give is, it's just an incredibly unadministerable test that they're asking the court to adopt, which would require, again, the court to weigh policy considerations that it doesn't undertake in ordinary statutory interpretation analysis. The court actually has rules of statutory interpretation that resolve cases like this about implied repeal or implied preclusion. And those are typically the way that the court addresses this kind of situation, because it doesn't want to get into empirical judgments about who is abusing, you know, who is the worst actor, who are these rights actually being created to protect, et cetera. I mean, this court's cases, Gonzaga especially, make it very clear what Congress has to do to create rights. And this is the rare statute that meets those incredibly exacting standards for creating rights. What do you make of the statement in Gonzaga that the standard for determining whether an individual statutory right exists is, quote, no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action? We don't, we don't disagree that that is the standard that we have to meet. But we do think that we meet it. We just don't have to meet that second step of the analysis. But we do have to show that there is a right as good as the right created in Title IX or the right created in Title VI. And we think we have that. Well, could you have sued under an implied private right of action? Individuals, when the regulations were enforced before FINRA was enacted, individuals attempted to bring suit. And I can't recall off the top of my head whether they were successful. I think that there were mixed results on whether this was actually brought under a private right of action. Implied right of action, obviously under the court's current case law, it could not be brought as an implied cause of action, we don't believe. But we do believe that it meets the test of Gonzaga. And it just fits like a glove with Section 1983, which is that it says you have these rights. These rights must be protected, the right to be free from chemical restraint. And then it fits in with Section 1983. What would you make of the argument that the rights to which 1983 refers in general are different from the kind of rights that a person may assert under spending clause legislation? Because usually, 1983 talks about rights secured by the Constitution and the laws. And usually, in those instances, the laws in themselves confer the right. But spending clause legislation doesn't confer a right in and of itself. It's dependent on the recipient of money agreeing. So would that, does that make it necessary for you to show that at the time of the adoption of 1983, it was generally understood that this type of right fell within the understanding of the rights to which 1983 refers? I don't think so. And I'll give you a few answers. The most important is that 1983 refers to new statutes. You know, Justice Scalia in Blessing talked about the fact that new rights created in new statutes would still be presumptively enforceable under Section 1983. No one would dispute that. And we take the statute for what the words meant at the time, not necessarily for the scope of the rights that would be protected. But even if you disagree with all of that, these are actually the kinds of rights that Section 1983 was enacted to protect, rights to bodily integrity and autonomy, fundamental rights. You know, if you map this onto the rights protected by the Constitution. So if you're asking if this kind of tort would be the kind of right that you could enforce, I think the answer is an emphatic yes. If you're asking about contract law, I don't think that the contract law analogy makes sense for numerous reasons. Most obviously, the spending clause legislation like this didn't exist and the kind of analogy to spending clause legislation didn't emerge until the 20th century. So there's just no reliable way to even know that Congress would have thought that by using the spending power as opposed to its commerce power when enacting a rights-creating statute, it was making a fundamentally different decision with respect to its application in 1983. Mr. Tutte, if you don't use the spending clause analogy, what would be the basis or the authority for creating the right in the first instance? Your Honor, this Court, I think the rights in this case could be conferred under the Court's broad commerce clause, jurisprudence. Well, let me back to it. I think I may have misstated that. Yes. If you don't use the contract analogy, all these spending clause cases have been defended on that basis. So you would have to now create a new theory. That was the basis for saying they were constitutional. If you eliminate that, what does that leave you with? Well, Your Honor, we don't, I think there's two steps to the question that you're asking me. The first is if we don't use the spending clause, the contract analogy, what test would we use to understand the constitutionality of spending clause legislation? But we don't actually dispute the contract analogy for purposes of the constitutionality of these kinds of laws. We don't say that this isn't the kind of law that the state has to enter into the agreement knowingly and voluntarily and have clear notice, an unambiguous notice. We don't disagree with any of those things which are, we think, the things that are key to the constitutionality of spending clause legislation. The HHC wants to take that analogy one step further and say that the Congress that enacted 1983 must have thought that that analogy that hadn't yet even really been explored by this court would further extend to how 1983 would be interpreted. And we don't see, I hope I'm being responsive. Well, I think the problem is that it's one thing to have the contract analogy as the basis. And then as you play it out, you say, well, if you continue that, you say, well, who is this contract between? And that's been the basis. It's the state is receiving the money, for example, under these conditions so the national government can require them to do certain things. Then the next step would be does it also give a right to a third party beneficiary to vindicate some of those rights? That's the way we have done it. Now, you're saying it's okay to have the contract analogy at the formation stage but you can drop it along the way if it becomes inconvenient on the back end, that is on the rights vindication, at the rights vindication stage. So I don't know if we've ever done that and I don't know if you can do that and still have the constitutional justification for it. Well, Your Honor, I would just go back to Pennhurst which really started this off. And it applied the contract analogy but said that the rights are part of the contract. So to the degree that you have individuals who are suing, it's because Section 1983 is part of the contract. Okay, I agree but is the beneficiary here a party to that contract? That's the rub. Your Honor, we don't dispute that Mr. Tlefsky was the beneficiary of this contract. We don't dispute that if you want to think of it that way. But it's not material for purposes of the analysis because Section 1983 says that he has the right to sue and the state promised that he would have the right to sue by entering into the agreement with the federal government. Thank you, Counsel. Anything further? Justice Alito? Ms. Gorsuch, Justice Barrett? Really quickly, wouldn't we have to believe that how the right came into being mattered to Congress? I mean, in response to both Justices Thomas and Alito, in order to get to the position of saying spending clause legislation is sort of carved out of 1983 because it confers these sort of conditional rights and doesn't confer them directly, doesn't that reduce to saying we understand that how a right came into being mattered to Congress in order to reach that result? I think that that would be one way to understand the question and that we don't think that it did matter to Congress because there's nothing in the text of Section 1983 that could be read to sort of care about the provenance of the rights you're trying to assert. Thank you, Your Honor. Thank you, Counsel. Mr. Robbins, rebuttal? Thank you, Mr. Chief Justice. I'd like to open with Justice Thomas' question to Mr. Tutte just a moment ago. What is unique about the spending clause is that it allows Congress to do things it could not otherwise constitutionally do. I submit that obviously this question is not presented today, but that the micromanaging of nursing care facilities in Marion, Indiana, is not something which Congress could have done under its Commerce Clause Authority or under its Section 514th Amendment Authority. The reason it can do these things is because the state has consented to it. So the question of consent is crucial to the constitutionality of the statute itself and that entails certain common law principles. The 1871 Congress did not have to imagine that Pennhurst would someday come down. It's not as if spending clause statutes only became contractual by nature because the court in 1981 in Pennhurst said that it was. It was always, those statutes were always contractual in nature and it therefore bears critically on the marriage of 1983 and FINRA that we ask the question what did 1983 mean when it was enacted? And the answer to that question is that the common law, generally speaking, prohibited individuals from bringing third party beneficiary claims on government contract cases. By the way, and this goes back, Justice Sotomayor's question that you asked me. You said what about these legal history professors who say the law was different? I contend that they've misread the law by, as I say, gerrymandering the denominator. But even if it were as murky as the law professors suggest that it was, the burden is not on us, I suggest, to show that the law was clear on our side. The burden is on the plaintiff who is asking that a certain right be created and enforced to show that it was settled in their direction. You have not heard any argument this morning that even remotely suggests that that's true. Now, how about ratification? That is a red herring if there ever was one. The language in the statute that overruled Souter, this court's Souter decision, made, I thought, painfully clear that it was doing very little. All it said was we are, we no longer will, we no longer will, you may no longer claim that a right is unenforceable because it is embedded in a provision that requires a state plan. But the statute goes on to say that all other arguments are preserved. It doesn't expand or decrease any other basis for saying that a right is unenforceable. And what's more, it preserves even the outcome in the decision in Souter. I see that my light is on, and I appreciate the court's indulgence. Thank you, counsel. The case is submitted.